UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CH HOLDING COMPANY and
CH/BRAND PARKING ASSOCIATES,

      Plaintiffs,                             Case Number 14-14430

v.                                           Honorable David M. Lawson

MILLER PARKING COMPANY,
JAMES N. MILLER, JAMES N. MILLER
REVOCABLE TRUST UTA DATED
NOVEMBER 19, 1998, and MILLER
PARKING SERVICES, LLC,

      Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO REMAND

Before the Court is the plaintiffs' motion to remand, which addresses the defendants' second notice of removal. After the case was removed the first time under docket number 12-10629, the Court found that several of the plaintiffs' claims were precluded as a matter of law because the bankruptcy trustee for the estate of Miller Parking Company, LLC (Miller Detroit) had the sole and exclusive legal standing to pursue them. The Court therefore dismissed those claims and remanded the remaining state law claims, which the Court found did not implicate the interests of the bankruptcy estate. After the case was remanded, the plaintiffs amended their complaint, and the defendants responded with a second notice of removal, contending that two of the claims in the amended complaint run afoul of the same rules of law that precluded the plaintiffs from pursuing the previously dismissed counts. Because adjudication of counts VIII and IX of the amended complaint require the adjudicating court to determine whether certain funds were property of the bankruptcy estate, those counts are "related to" the bankruptcy case, and therefore this Court has

jurisdiction over those counts under 28 U.S.C. § 1334(b). The removal of the case was proper. The Court will retain jurisdiction over those counts, but remand the remaining state law claims under 28 U.S.C. § 1367, because those counts do not relate to the bankruptcy or to the other counts.

I.

On September 12, 2013, the Court filed an opinion and order in *CH Holding v. Miller Parking*, case number 12-10629, granting in part the defendants' motion for judgment on the pleadings, dismissing counts I through VII, X, and XI of the complaint, and remanding the remaining claims (counts VIII, IX, and XII through XIV) to the Oakland County, Michigan circuit court. The plaintiffs filed a motion for reconsideration, and the James Miller defendants filed a motion for relief under Rule 60 from the order of remand. After a considerable period of forbearance jointly requested by the parties, due to their prolonged efforts to settle the case, the Court filed an opinion and order on May 12, 2014 denying both motions. In denying the defendants' motion, the Court noted that "[i]f the plaintiffs seek to amend their pleadings to add claims that would implicate the Court's bankruptcy jurisdiction by seeking directly to recover funds that are the property of either the Bruce Miller or Miller Parking bankruptcy estates, then the defendants may seek their relief by taking appropriate action to remove the dispute to a federal forum." Op. & Order [dkt. #74] at 6, *CH Holding v. Miller Parking Company*, No. 12-10629 (E.D. Mich. May 12, 2014).

On May 14, 2014, following protracted litigation regarding a proposed settlement between the plaintiffs and certain defendants ("the Weinstein and Stein defendants"), the Court affirmed the approval of the settlement by the bankruptcy court. Op. & Order [dkt. #14], *In re Miller Parking*, case number 13-14963 (E.D. Mich. May 14, 2014). The Court later entered a stipulated order dismissing all claims against the Weinsteins and Steins in the related matter of *Lim v. Miller Parking*

*Company*, 11-14422. From the caption of the recently re-removed amended complaint in *CH Holding*, it appears that all claims against the Weinsteins and Steins also were dismissed in the Oakland County case (as was required by the partial settlement). Only the Miller Defendants (James N. Miller and his various family trusts) now remain in *CH Holding* and in *Lim v. Miller Parking*.

Subsequently, in response to concerns raised by the defendants about the scope of the claims presented in counts VIII and IX, the state court ordered the plaintiffs to file an amended complaint expressing more precisely the nature of the recovery sought in those counts. In count VIII of their first amended complaint for conversion against James N. Miller individually, the plaintiffs now allege that James Miller, in his capacity as president and managing agent of Miller Detroit, authorized payment to a law firm for the attorney's fees incurred by Bruce Miller in defense of the 2004 CH Holding lawsuit in state court. The plaintiffs allege that James Miller had no legal authority to spend Miller Detroit's funds in that fashion, and they aver that some of those funds came from parking revenues that should have been held in trust for CH Holding and CH/Brand. The plaintiffs say that diverting those funds for attorney's fee payments benefitted James Miller personally, and as a result he is liable for statutory and common law conversion.

Count IX alleges conspiracy against James Miller on the same factual premises as count VIII, based on allegations that James N. Miller, Bruce Miller, and Miller Detroit acted together in their scheme to use company funds to pay Bruce Miller's attorney's fees, instead of remitting "some or all of the Parking Revenues to CH/Brand and [CH Holding]." Am. Compl. ¶ 47.

On November 19, 2014, after the amended complaint was filed, the James Miller defendants filed their present notice of removal on the ground that the claims in amended counts VIII and IX "arise under" the Bankruptcy Code, 11 U.S.C. § 544(b), and "relate to" the administration of the

Miller Detroit bankruptcy estate, because those counts seek the recovery of assets that ought rightfully to be preserved for the estate and its creditors. In their motion to remand, the plaintiffs argue that the challenged counts seek recovery solely against James N. Miller individually and do not in any way implicate the bankruptcy estate.

II.

The plaintiffs contend that the case must be remanded because the original claims in counts VIII and IX did not implicate the bankruptcy estate, and the amended complaint changes nothing about the substance of those claims, but merely pleads additional factual detail to explain how the alleged wrongs were accomplished. The defendants respond that the plaintiff's amended claims do implicate the property of the bankruptcy estate, because adjudication of the claims necessarily requires a determination of the bankruptcy estate's ownership of specific property. The defendants also argue that if James N. Miller is to be held liable for wrongful payment of attorney fees in the Oakland County (2004) lawsuit, then he has a right to seek contribution from the parties on whose behalf at least some of those fees allegedly were paid, which, according to the amended complaint, were Bruce Miller and Miller Detroit, both of which are in bankruptcy presently. The defendants have the better argument, at least as to their first premise.

The defendants, as the removing parties, must establish that the Court has subject matter jurisdiction to adjudicate the case. *Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459, 462 (6th Cir. 2010). A civil action brought in a state court may be removed to federal court if the federal court would have had original jurisdiction. 28 U.S.C. § 1441(a). The party invoking the federal court's jurisdiction has the burden of establishing subject matter jurisdiction. *Cleveland Housing Renewal*

*Project v. Deutsche Bank Trust Co.*, 621 F.3d 554, 559 (6th Cir. 2010) (citing *Hertz Corp. v. Friend*, 559 U.S. 77, 96 (2010)).

"A district court's jurisdiction over bankruptcy cases and proceedings comes from 28 U.S.C. § 1334(b), which gives the district courts 'jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.'" *In re Greektown Holdings, LLC*, 728 F.3d 567, 577 (6th Cir. 2013). "The grant of jurisdiction over proceedings 'related to' the bankruptcy case is quite broad." *Ibid.* (citing *Celotex Corp. v. Edwards*, 514 U.S. 300, 307-08 (1995)). "The test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Ibid.* (citing *Lindsey v. O'Brien, Tanski, Tanzer and Young Health Care Providers of Conn. (In re Dow Corning Corp.)*, 86 F.3d 482, 489 (6th Cir. 1996)) (quotation marks and alterations omitted). "'An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.'" *Ibid.* (quoting *Lindsey*, 86 F.3d at 489). "The mere fact that there may be common issues of fact between a civil proceeding and a controversy involving the bankruptcy estate does not bring the matter within the scope of section 1334(b)." *Ibid.* (quotations and alterations omitted). "Instead, there must be some nexus between the 'related' civil proceeding and the title 11 case." *Ibid.*

"For the purpose of determining whether a particular matter falls within bankruptcy jurisdiction, it is not necessary to distinguish between . . . proceedings 'arising under,' 'arising in,' and 'related to' a case under title 11 . . . . [I]t is necessary only to determine whether a matter is at least 'related to' the bankruptcy." *In re Wolverine Radio Co.*, 930 F.2d 1132, 1142 (6th Cir. 1991).

The "related to" inquiry asks . . . whether the *outcome* of the claims would effect the estate," and, accordingly, "whether there is a nexus between the other proceeding and the *bankruptcy case*." *Greektown*, 728 F.3d at 578 (citing *Lindsey*, 86 F.3d at 489) (emphasis in original). Even where a claim is not "property of" the bankruptcy estate, a case based on that claim may still be "related to" the bankruptcy, where the trustee and another claimant both seek to recover "the same limited pool of money, in the possession of the same defendants, as a result of the same acts, performed by the same individuals, as part of the same conspiracy." *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998).

The plaintiffs' amendments to counts VIII and IX expand — or perhaps clarify — the nature of their conversion claim against James Miller. The plaintiffs now say that James Miller took money that belonged to Miller Detroit (or that Miller Detroit held in trust for some of the plaintiffs) and paid it to a law firm defending Bruce Miller in a state court lawsuit in which he was charged with breaching his fiduciary duties to these same plaintiffs. In other words, the plaintiffs seek recovery from James Miller for his hand in alienating money held by Miller Detroit, either as its own or in trust.

The plaintiffs do not dispute this characterization of their intentions. However, they argue that because the object of their claim is James Miller — and they intend to confine their recovery only to him (at least on the conversion claims) — the Miller Parking bankruptcy is not implicated, and therefore their amended claims do not relate to the bankruptcy. That argument ignores the obvious point, however, that in order to determine whether James Miller is guilty of conversion, the adjudicator must first determine whether the money paid for attorney's fees was spent wrongfully and therefore should still belong to Miller Parking. It is difficult to avoid the ensuing conclusion

that such a finding would "relate to" the bankruptcy case, since it would have an impact on the composition of the property of the estate. It would affect the handling and administration of the bankrupt estate, by markedly increasing or decreasing the recovery and distribution that the trustee can accomplish. *In re Greektown Holdings, LLC*, 728 F.3d at 577. The plaintiffs disavow any intention of attempting to recover from "the same limited pool of money, in the possession of the same defendants, as a result of the same acts, performed by the same individuals, as part of the same" conduct, all of which also are at issue in the trustee's pending action against the same defendants. *Fisher*, 155 F.3d at 882. But the adjudication of the newly amended counts VIII and IX would require a determination of the same facts as if the plaintiffs were trying to recover the alienated funds for themselves alone. And that decision leads to a determination of what is — or was — the property of the Miller Detroit bankruptcy estate.

There is another issue looming here that also "relates to" the Miller Detroit bankruptcy: if James Miller assisted in the conversion of Miller Parking assets, then should the cause of action for conversion belong to the trustee as property of the bankruptcy estate?

"A bankruptcy estate is comprised of 'all legal or equitable interests of the debtor in property as of the commencement of the case.'" *In re Shelbyville Rd. Shoppes, LLC*, 775 F.3d 789, 794 (6th Cir. 2015) (quoting 11 U.S.C. § 541(a)(1)). As soon as a bankruptcy petition is filed, the estate becomes "the owner of all of [the debtor's] property, including tort claims that accrued before [the petition was filed]." *Auday v. Wet Seal Retail, Inc.*, 698 F.3d 902, 904 (6th Cir. 2012). "[A]ll causes of action that hypothetically could have been brought pre-petition are property of the estate . . . even if the debtor was unaware of the claim," and the "entire cause of action is property of the estate, even if further post-petition damages were incurred." *Tyler v. DH Capital Mgmt., Inc.*, 736 F.3d 455, 462

(6th Cir. 2013) (quotations and alterations omitted). This "[p]roperty of the estate is central to the bankruptcy process," because it "becomes the 'pot' from which all claims against the debtor will be paid pursuant to the Bankruptcy Code's priority scheme." *In re Robinson*, 764 F.3d 554, 559 (6th Cir. 2014) (quotations and alterations omitted).

Where the plaintiffs' "cause of action [against the debtor] would be based on facts generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors," only the trustee may pursue it, and claims by individual creditors are precluded. *In re Emoral, Inc.*, 740 F.3d 875, 881 (3d Cir. 2014). Accordingly, where a "creditors' claims against [] non-debtor fiduciaries depend[] on the non-debtor's misconduct *with respect to the corporate debtor*," and the claims are premised upon alleged "transfers *from the debtor* to a non-debtor control person or entity," the claims are "general claims" that the trustee has exclusive standing to pursue on behalf of all creditors of the estate. *In re Teknek, LLC*, 563 F.3d 639, 649 (7th Cir. 2009) (emphasis in original) (noting that the Seventh Circuit has found claims to be property of the estate where they were based on "alleged breach[es] [by non-debtor defendants] of fiduciary duties to the debtor" or "looting of the debtor corporation in which the plaintiffs had invested"); *see also N.L.R.B. v. Martin Arsham Sewing Co.*, 873 F.2d 884, 888 (6th Cir. 1989) ("To allow a creditor of the bankrupt to pursue his remedy against third parties on a fraudulent transfer theory would undermine the Bankruptcy Code policy of equitable distribution by allowing the creditor 'to push its way to the front of the line of creditors.'").

The plaintiffs' attempt artfully to plead their claims as merely seeking to recover from James N. Miller individually his personal funds and certain funds held "in trust" for them by Miller Detroit. That framing does not distinguish meaningfully those claims from other property of the estate that

the trustee has the sole right to recover and distribute. In their complaint, the plaintiffs allege that (1) Miller Detroit received parking revenues that were the property of the plaintiffs and which it "held in trust" for their benefit; (2) James Miller and Miller Detroit refused to remit the parking revenues to the plaintiffs and converted the funds to their own use, in order to pay attorney fees incurred by Bruce Miller and Miller Detroit in defending the 2004 Oakland County lawsuit; (3) the payment of attorney fees from funds held by Miller Detroit was authorized by James Miller as president of the company, but was expressly prohibited by the terms of the governing corporate articles; and (4) the "retention of the Parking Revenues by [Miller Detroit] and James N. Miller and the improper use of the Parking Revenues by James N. Miller and [Miller Detroit] for the benefit of [James] Miller's father, Bruce Miller, and for the benefit of [Miller Detroit] interfered with and deprived CH/Brand and [CH Holding] of [their] ownership and interest in the Parking Revenues." Compl. ¶ 43.

As the revised allegations now make clear, the plaintiffs are seeking not only to target James Miller, but also are attempting to "jump the queue" and seize upon certain specific assets of Miller Detroit collected, held, and ultimately paid out in the course of its operations, to which they purport to have a superior or individualized claim. They contend that they are entitled to recover these funds because, rather than surrendering them as required, Miller Detroit instead wrongfully paid them out to the law firm that defended it and Bruce Miller during the five-year litigation in the 2004 Oakland County lawsuit, and James Miller had a hand in that decision. However, allegations that certain funds were collected on the one hand, and (perhaps wrongly) paid out on the other, do not suffice to excise those funds — and the tort damages that may result from their alleged conversion — from the scope of the "property of the estate." If, as the plaintiffs claim, the funds wrongly were paid out,

then they must be recovered *by the estate*; the fact that funds were paid to defend the debtor or its principals against a lawsuit brought by a particular creditor does not mean that only that creditor may recover them to the exclusion of all others. The fact that the plaintiffs assert a pre-petition interest in the funds as a result of certain contractual or fiduciary obligations establishes only that they have a possibly meritorious claim against the estate, not that they have a right to pursue the exclusive recovery of any arbitrary set of dollars that they designate as theirs alone from among the many millions paid out by Miller Detroit to numerous parties over the years preceding the filing of its petition.

In *In re National Century Financial Enterprises, Inc.*, 423 F.3d 567 (6th Cir. 2005), the Sixth Circuit confronted a strikingly similar attempt at artful pleading by a creditor attempting to make an end run around the bankruptcy process. The court of appeals in that case held that the district court properly had affirmed the decision of the bankruptcy court enforcing the automatic stay under 11 U.S.C. § 362(a) against the creditor's state court action seeking damages from a third-party (non-debtor) defendant bank, which the creditor alleged had refused to obey the creditor's instructions to remit funds held by the bank in the debtor's accounts. The Sixth Circuit explained that, no matter how they were construed, the claims pleaded in the creditor's state court complaint could not be allowed to proceed, because they necessarily would require the court to determine who owned the disputed funds. The creditor's claims did not place those funds beyond the scope of the "property of the estate" merely because the creditor asserted that it had an exclusive right to the funds under a "constructive trust" theory. The court summarized the plaintiff's argument, which is strikingly parallel to those raised by *CH Holding* here:

> The district court held that "the Louisiana complaint, though naming non-debtor JP Morgan as a defendant, seeks a determination that the money in the Debtors' bank

> accounts belongs to [creditor] Amedisys." The bankruptcy court similarly concluded that Amedisys, through the Louisiana action, sought to obtain ownership rights of the disputed accounts receivable. Amedisys, on appeal, contends that these holdings were misguided, because the Louisiana action concerns only JP Morgan's failure to follow [the debtor's] instructions to remit $7.3 million to Amedisys. Amedisys argues that it merely seeks money damages from JP Morgan, because JP Morgan breached a duty to transfer the property to Amedisys.

*Id.* at 575. The court rejected that argument, concluding that, although the plaintiffs sought relief only against the bank, "every count in the complaint requires the court to adjudicate whether Amedisys had a rightful claim to [the disputed funds]." *Ibid.*

The Seventh Circuit has rejected similar attempts at artful pleading by individual creditors, holding that "creditors' claims against [] non-debtor fiduciaries [that] depend[] on the non-debtor's misconduct *with respect to the corporate debtor*," where the claims are premised upon alleged "transfers *from the debtor* to a non-debtor control person or entity," are "general claims" that the trustee has exclusive standing to pursue on behalf of all creditors of the estate. *In re Teknek, LLC*, 563 F.3d 639, 649 (7th Cir. 2009) (emphasis in original) (noting that the Seventh Circuit has found claims to be property of the estate where they were based on "alleged breach[es] [by non-debtor defendants] of fiduciary duties to the debtor" or "looting of the debtor corporation in which the plaintiffs had invested").

After oral argument on the remand motion, the Court permitted the parties to file supplemental briefs to address the impact of *National Century* on the present motion. The plaintiffs filed a supplemental brief in which they argue that *National Century* is distinguishable from the present case because (1) in *National Century* the creditor plaintiff sought to have funds held in specific bank accounts in the debtor's name turned over to the creditor by the bank, which was the defendant in the state court action (the debtor was not named in state court); (2) the present

-11-

complaint, in count VIII, seeks money damages solely from James N. Miller individually, for alleged personal conduct that involved mishandling funds that the plaintiffs contend were their property, held in trust by Miller Detroit; and (3) unlike in *National Century*, the trustee of the Miller Detroit bankruptcy estate has not undertaken any action to enforce the automatic stay under 11 U.S.C. § 362(a)(3), or to pursue the specific claim for conversion of parking revenues that is raised by the present plaintiffs in their state court amended complaint.

The plaintiffs rely principally on *In re Cincom iOutsource, Inc.*, 398 B.R. 223, 228-29 (Bankr. S.D. Ohio 2008), in which the bankruptcy court distinguished *National Century* and found that it did not bar a state court proceeding by a creditor against a non-debtor and the parent company of a bankrupt debtor corporation. The parent (Cincom Systems, Inc., ["Systems"]) and its subsidiary (Cincom iOutsource, Inc. ["iOutsource"]) entered into a number of contracts with various customers to provide leased equipment. Customer financing for the leases was provided by several lenders, including Fifth Third Bank. Much of the equipment provided through the leases allegedly was obsolete, broken, or never delivered to the customers who were supposed to receive it.

One such customer, plaintiff Universal Equipment Leasing, LLC ("UEL"), filed a complaint in the Northern District of California against Fifth Third Bank and Systems, alleging that the two had conspired to commit fraud in the course of the leasing deals. The trustee of the iOutsource bankruptcy estate moved to stay the UEL action and a number of similar cases brought by other plaintiffs similarly situated. The trustee argued that iOutsource was the alter ego of its parent, Systems, and that any judgment against Systems therefore would deplete funds that should be retained and turned over to satisfy the claims of all iOutsource creditors. The trustee also contended that any judgment against the parent would obstruct the recovery of funds under a fraudulent transfer

or avoidance theory, which the trustee alleged wrongly were conveyed from the subsidiary to the parent.  UEL alleged that Fifth Third had breached its fiduciary duties to UEL in the course of brokering and financing the fraudulent leases, and that it therefore was entitled to a judgment against Fifth Third for damages that UEL had suffered as a result of that breach.

The bankruptcy court found that the action against Fifth Third Bank for breaching its fiduciary duty in negotiating and brokering the equipment leases "has nothing to do with Systems' alleged duty to iOutsource or iOutsource's creditors." *Cincom iOutsource*, 398 B.R. at 229.  The court held "that UEL's prosecution of this lawsuit against Fifth Third, a non debtor, [does not] in any way implicate[] estate property or usurp[] the Trustee's ability to pursue the various claims he is asserting against Systems in bankruptcy court." *Ibid.*  Because "Fifth Third must answer for its own conduct in the California litigation surrounding these transactions," the court "conclude[d] that a potential judgment against Fifth Third, a solvent entity, does not actually deplete the bankruptcy estate of property by depriving the Trustee, in this case, of any claims or defenses he might want to assert in the bankruptcy litigation."  *Ibid.*

The bankruptcy court also observed that the claims against Fifth Third and the debtor were discrete because each of them entered had entered into separate arrangements with various parties to perform distinct duties, and Fifth Third's defenses to the claims would be entirely separate from any that might be raised by either Systems or iOutsource (and, consequently, by the Trustee standing in the shoes of the debtor in attempting to defend any related claims):

> Fifth Third and iOutsource are separate, unaffiliated companies who entered into and, then, were supposed to perform distinct obligations under the parties' various agreements. . . .  Fifth Third has no derivative defense to assert that can be said to belong to the bankruptcy estate of iOutsource.  Neither is this situation analogous factually to the one in *Patton* where the stay was extended to halt nonbankruptcy litigation because of its negative impact on the estate.  An entry of judgment against

> Fifth Third would not necessarily impair the debtor's rights against one of its general partners or affiliated entities, thus making it less likely that that partner or affiliate would be able to make a contribution to pay the debtor's creditors.

*Ibid.*

The plaintiffs here are correct in their observation that, unlike *National Century*, the present complaint does not specifically assert a claim for turnover of identifiable funds in any discrete bank account held in the name of the debtor. However, the plaintiff in *National Century* sought both a turnover of certain funds and damages on a number of theories. The *National Century* plaintiff alleged that: (1) it was entitled to specific performance of an "implied contract" for the benefit of the plaintiff, including a refund of the disputed funds; (2) it was a third-party beneficiary of a trust relationship between the bank and the debtor; (3) the bank breached a fiduciary duty to the plaintiff to ensure that funds due the plaintiff were not mishandled or withheld; (4) the bank converted the funds by refusing to deliver them upon demand; and (5) the bank was unjustly enriched by its retention of the funds. *National Century*, 423 F.3d at 572. The Sixth Circuit held that "[b]ecause the Louisiana action seeks to obtain the accounts receivable held in a JP Morgan account in the name of [the debtor entity], and because the accounts receivable likely constitute property of the bankruptcy estate, the bankruptcy court properly enforced the automatic stay under 11 U.S.C. § 362(a)(3)." *Id.* at 575. However, the court of appeals also observed that "[t]he district court correctly found that while only some counts in the complaint pray the court to order JP Morgan to remit the disputed accounts receivable to Amedisys, *every count in the complaint requires the court to adjudicate whether Amedisys had a rightful claim to that property*." *Ibid.* (emphasis added). The same is true here.

Resolution of the present plaintiffs' claim for conversion, by definition, will require any court that decides it to resolve the question of who owned — and consequently who now has a rightful claim to — the $900,000 in allegedly mishandled parking revenues that the plaintiffs seek to have returned to them (along with damages suffered as a result of the wrongful deprivation of the funds). "Conversion, both at common law and under [Michigan Compiled Laws § 600.2919a] is defined as any distinct act of domain wrongfully exerted over *another's personal property* in denial of or inconsistent with the rights therein." *Aroma Wines & Equip., Inc. v. Columbian Distribution Servs., Inc.*, --- N.W.2d ---, ---, No. 148907, 2015 WL 3772434 (Mich. June 17, 2015) (emphasis added) (quotation marks and citation omitted). "Money is treated as personal property, and an action may lie in conversion of money provided that there is an obligation to keep intact or deliver the specific money in question, and where such money can be identified." *Dunn v. Bennett*, 303 Mich. App. 767, 778, 846 N.W.2d 75, 81 (2013) (quotation marks omitted). "Conversion may occur when a party properly in possession of property uses it in an improper way, for an improper purpose, or by delivering it without authorization to a third party." *Dep't of Agric. v. Appletree Mktg., L.L.C.*, 485 Mich. 1, 14, 779 N.W.2d 237, 244-45 (2010) (footnotes omitted). Just as the Sixth Circuit held in *National Century*, such a determination inescapably implicates the bankruptcy estate, because a judgment that the disputed funds were the exclusive property of the plaintiffs necessarily would preclude any recovery of those same funds for the benefit of all creditors by the bankruptcy estate. *See National Century*, 423 F.3d at 576 (observing that "[w]hatever determination is made in the Louisiana action concerning the prebankruptcy ownership of the accounts receivable will necessarily be relevant to postbankruptcy ownership as well").

There is yet another reason why the amended Counts VIII and IX relate to the Miller Detroit Bankruptcy. Although the Miller Detroit trustee has not yet asserted any claim against the James Miller defendants on precisely the same theory as that alleged by the CH Holding plaintiffs, she has raised claims in *Lim v. Miller Parking*, 11-14422, which seek recovery for the same type of harm, from the same individual defendant (James N. Miller), for the same type of conduct (mishandling and wrongly distributing funds of debtor Miller Detroit). In her complaint, the trustee specifically seeks damages against James N. Miller for breaches of fiduciary duty, by which she contends James Miller enriched himself at the expense of the debtor and its rightful creditors:

> 44. Defendant James N. Miller owed a duty of loyalty to the Debtor and was at all relevant times a fiduciary of the Debtor.
> 45. Defendant *James N. Miller breached his duties to the Debtor* in causing Debtor to handle Defendant MPC's administrative work for no consideration and *causing Debtor to make additional transfers to* Defendant MPC and *the individual Defendants [including James N. Miller] for no consideration* or less than fair consideration during a period when Debtor was insolvent.
> 46. As an owner of Defendant MPC, Defendant *James N. Miller profited personally* from the enrichment of Defendant MPC at Debtor's expense.
> 47. As a result of Defendant James N. Miller's breach of his duties to Debtor, *the Debtor suffered substantial losses* and this bankruptcy case.

Am. Compl. [dkt. #27-1], *Lim v. Miller Parking Company*, No. 11-14422 (E.D. Mich. Oct. 24, 2012) (emphasis added).

It is self-evident that any judgment against James N. Miller individually for wrongs committed within the scope of his position as president of Miller Detroit very well could "impair the debtor's rights against one of its [principals], thus making it less likely that that [party] would be able to make a contribution to pay the debtor's creditors." *In re Cincom*, 398 B.R. at 229. If the CH Holding plaintiffs prevail on their claims, any success they have in executing a judgment against James Miller may substantially impair the trustee's ability to collect against him for congruent

liability based on substantially similar and overlapping allegedly wrongful conduct that equally harmed all creditors of the Miller Detroit estate. Moreover, unlike in *Cincom*, this is not a case where the CH Holding plaintiffs, Miller Detroit, and James N. Miller reasonably can be cast as "separate, unaffiliated [entities] who entered into and, then, were supposed to perform distinct obligations under [] various agreements." The relations between the parties here certainly were "various" in their scope, complexity, and terms. But the alleged conduct by James Miller in handling *all* of the funds and affairs of Miller Detroit was inextricably intertwined with the handling of the specific funds that the plaintiffs now seek to recover for themselves alone, possibly to the detriment of all others who may have been harmed by the same course of conduct. The plaintiffs allege, in essence, that James Miller mishandled funds held by Miller Detroit and made payments that ought not to have been made, leaving the company bereft of means to satisfy the demands of the plaintiffs as judgment creditors. But they have not shown any way in which this particular harm, which they have attempted to isolate and seek to redress as theirs alone, can be segregated from the greater common harm done to all Miller Detroit creditors by all of the various related devices that James Miller allegedly employed to the same end.

If Miller Detroit wrongfully paid out any funds for the benefit of any third party in the form of unauthorized attorney fees (or in any other wrongful manner), rather than retaining those funds in order properly to pay them when and to whom they were due, then the debtor's assets were depleted to the detriment of *all* creditors, not just the plaintiffs in this case. Therefore, the claims raised in counts VIII and IX of the amended complaint "relate to" the Miller Detroit bankruptcy case, and the Court has original jurisdiction over them.

### III.

There are other counts in the amended complaint, which the parties agree do not relate to the bankruptcies and which ought to be remanded to state court. In their response to the motion to remand, the defendants concede that "Counts XII and XIII were brought against James N. Miller and/or Miller Parking Services, LLC for conversion and trespass regarding incidents subsequent to December, 2009 and those claims are properly before the Oakland County Circuit Court." Those claims were joined in the plaintiffs' complaint filed in state court, presumably because they arose against some of the common defendants. They are not "related to" the Miller Detroit bankruptcy. *In re Wolverine Radio Co.*, 930 F.2d 1132, 1142 (6th Cir. 1991) (quoting *In re Pacor*, 743 F.2d 984, 994 (3d Cir. 1984)). Nor are they "so related to" the other claims in the complaint "that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Therefore, the Court will remand those counts to state court for adjudication.

### IV.

Counts VIII and IX of the amended complaint filed in state court relate to the Miller Detroit bankruptcy, and therefore this Court has original jurisdiction over those counts under 28 U.S.C. § 1334(b). Counts XII and XIII do not relate to the bankruptcy, nor are they subject to the Court's supplemental jurisdiction.

Accordingly, it is **ORDERED** that the plaintiffs' motion to remand [dkt. #4] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that this Court has subject matter jurisdiction over VIII and IX of the amended complaint, and those counts shall be adjudicated in this Court.

It is further **ORDERED** that the remaining allegations of the amended complaint are **REMANDED** to the Oakland Count Circuit Court for adjudication.

s/David M. Lawson  
DAVID M. LAWSON  
United States District Judge

Dated: June 23, 2015

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 23, 2015.

                                        s/Susan Pinkowski  
                                        SUSAN PINKOWSKI